cides, fungicides, and rodenticides," we find the foregoing observation apposite to the estoppel claim that the Plaintiffs seek to raise here. To the extent that Roberson v. E.I. DuPont de Nemours & Co., 863 F. Supp. 929, 932-33 (W.D. Ark. 1994), and Hurley v. Lederle Lab. Div. of Am. Cyanamid, 863 F.2d 1173, 1179-80 (5th Cir. 1988), suggest a different result, we reject their analyses for reasons expressed by the Court, in Reutzel. See, Reutzel v. Spartan Chemical Co., supra at 1283-84. Accordingly, we examine the Plaintiffs' causes of action, which have been pled here, with the Symens standard as the focus of our review.

The Plaintiffs contend that the Defendant cannot be protected from their claims by the preemption doctrine because, by "present-[ing] false information in the process of obtaining conditional approval to sell its product," which resulted in APHIS "order[ing] the exact serials of the product sold to plaintiffs to be withdrawn from the marketplace," the Defendant never actually had APHIS's approval to sell the vaccine. Plaintiffs Brief at 2. The Plaintiffs urge that, because "[i]t is unlawful," under 9 C.F.R. §113.5, "for a manufacturer to release an animal vaccine before completion of all testing required by the APHIS for that specific vaccine," and because the Defendant obtained its license to market Biocom-DP on the basis of a "No test" which, under 9 C.F.R. §113.5(d) "is not considered a valid test for the purposes of approval of a product

for sale," the Defendant violated a substantive APHIS standard when it sold PB13 serial to the Plaintiffs. The Plaintiffs identify no other substantive requirement of VSTA, or of APHIS's regulations, as having been violated by the Defendant's marketing of Biocom-DP, which contained PB13. The Defendant counters that, even if its testing of PB13 should have been reported as a "No test," the APHIS regulations merely required a retest, which the Defendant conducted, in January, and again in April of 2000, obtaining results which demonstrated, to APHIS's satisfaction, that PB13 was not viricidal. As a result, the Defendant claims that it is protected from the Plaintiffs' State law claims by the doctrine of preemption, as it has satisfied all of the substantive requirements of APHIS's regulations.

In part, the Defendant urges that we apply a broader sweep of preemption than expressed in Symens I and II, based on the Supreme Court's recent decision in Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341 (2001), where the Court extended implied preemption, under the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976, Title 21 U.S.C. §301, to preclude State law claims in the nature of a "fraud-on-the-agency" cause of action. In Buckman, the plaintiff alleged, as a sole cause of action, that the defendant, who served as a regulatory consultant to a medical device manufacturer, made fraudulent mis-

representations to the Food and Drug Administration ("FDA"), in order to secure clearance to market the manufacturer's medical device. There, the plaintiffs employed a "but for" argument: "Had the representations not been made, the FDA would not have approved the devices, and plaintiffs would not have been injured." Id. at343.

In rejecting that argument, and in extending implied preemption, so as to preclude such a claim, the Court first noted that a "fraud-on-the-agency" claim is uniquely Federal, where the agency is a part of the Federal Government, and "is hardly 'a field which the States have traditionally occupied,' such as to warrant a presumption against finding federal preemption of a state-law cause of action." Id. at 347. The Court went on to note the substantial power afforded to the FDA so as to police for such fraud, and the flexibility that the agency was empowered to exercise in addressing the critical needs of the medical device market. The Court reasoned that fraud-on-the-agency claims could discourage potential applicants from seeking licensure for medical devices if "complying with the FDA's detailed regulatory regime" would cast the applicants in "the shadow of 50 States' tort regimes." Id. at 349. As the Court reasoned:

> Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Agency, will later be judged insuffi-

> cient in state court. Applicants would then have an incentive to submit a deluge of information that the Agency neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application. As a result, the comparatively speedy §510(d) process could encounter delays, which would, in turn, impede competition among predicate devices and delay health care professionals' ability to prescribe appropriate off-label uses.

Id. at 351.

Here, the Defendant characterizes the Plaintiffs' contention, that the Defendant failed to record test results as a "No test," as a variant of a purported fraud-on-the-agency claim, which is preempted by VSTA, under the rule expressed in Buckman.

Of course, the simplest response to this assertion is that the Plaintiffs, here, have failed to allege a "fraud-on-the-agency" claim in their Complaint. See, Plaintiffs Brief, at p.5 ("The ["fraud on the agency"] argument must fail from a clear reading of plaintiffs' complaint -- plaintiffs never allege fraud on the agency or noncompliance as an independent claim."). We understand the Defendant's misapprehension, however, as the Plaintiff's argument has suggested some form of duping of APHIS, by the Defendant, but the argument finds no substance in either the allegations of the Plaintiffs' Complaint, nor in the facts presented in this Record. If, as the Defendant perceives, the Plaintiffs are asserting some fraud-on-APHIS, by the Defendant's regulatory disclosures, it is a perception that, upon the Record here presented, APHIS has

not joined.[7] More importantly, we read Buckman as expressly distinguishing the Supreme Court's prior holding in Medtronic. As the Court reasoned:

> Notwithstanding the fact that Medtronic did not squarely address the question of implied pre-emption, it is clear that the Medtronic claims arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of FDCA requirements. * * * In the present case, however, the fraud claims exist solely by virtue of the FDCA disclosure requirements. Thus, although Medtronic can be read to allow certain state-law causes of actions that parallel federal safety requirements, it does not and cannot stand for the proposition that any violation of the FDCA will support a state-law claim.

Id. at 352-53.

Notably, the Supreme Court's holding in Medtronic was expressly considered by our Court of Appeals in Symens I, and did not deter the Court from concluding that "broadly pleaded claims are preempted[, under "VSTA as construed by APHIS,] to the extent that

---

[7]Although APHIS expressed disapproval of the Defendant's report of viricidal test results, in June of 1998, the Record is devoid of any suggestion, let alone a showing, that APHIS regarded the report as a "fraud," a "misrepresentation," or a "false statement." Rather, APHIS appears to take exception to the statistical basis upon which that report of viricidal results was based. One can be guilty of an erroneous, statistical computation -- if one there be -- without imputing demonic purposes, and this Record intimates no underhandedness on the Defendant's part. While APHIS withheld PB13 from the marketplace, in January of 2000, there is nothing to suggest, as but one example, that the Defendant's licensure, as a manufacturer of animal biotics, was ever so slightly in jeopardy. If such evidence exists, it is not disclosed in this Record.

they rely upon 'liability-creating-premises' that are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, purity, or labeling of [APHIS] licensed vaccines." Symens I, supra at 1055 and 1056. As a consequence, we find nothing in Buckman which alters the holdings in Symens I and II, at least on the Record presented here.

B. Legal Analysis. Since they involve distinct analytical considerations, we separately address the Plaintiffs' causes of action for strict liability, for negligence, and for a breach of implied warranties, from their causes of action for a breach of express warranties, false representation, and for a claimed violation of the Minnesota Consumer Fraud Act.

1. The Plaintiffs' Claims for Strict Liability, for Negligence, and for a Breach of Implied Warranties.

As we have briefly recounted, on June 26, 1998, the Defendant submitted to APHIS, on Form 2008, the results of the viricidal activity test, which had been performed on serial PB13, in order to secure permission for the release of that serial to the public. See, Exhibit F, attached to Affidavit of Todd M. Johnson, at Bates stamped Th00113-115. Solely on the basis of the results disclosed on that Form 2008, APHIS authorized the release of the PB13 serial on June 28, 1998. Although APHIS was empowered to do so, in conjunction with its consideration of the safety, efficacy,

potency, purity, or labeling of that serial, APHIS did not request copies of the Defendant's Bench Records which related to that viricidal activity test, nor did it elect to defer a decision on the release of that serial until APHIS had secured confirming test results.

It was not until December of 1999, or January of 2000 -- about a year and one-half after APHIS had approved the release of PB13 -- that the Defendant heard anything further from APHIS as to that serial. At that time, APHIS requested copies of the Bench Records that pertained to serial PB13. In a letter dated January 6, 2000, a representative of APHIS confirmed an earlier telephone call, on that same date, in which the Defendant was directed to "immediately stop distribution and sale" of BP13, and to quarantine any remaining inventory." See, Exhibit K attached to Affidavit of Todd M. Johnson, at Bates No. TH01364. The letter explained further, as follows:

> This notification is based on a review by the Center for Veterinary Biologics (CVB) of your bench records. The records are deficient in determining the Viricidal Activity (VA) of these serials. See attached memo by Dr. James Tanner, Chief Statistician, CVB.
>
> The VA results should have been reported on the APHIS Form 2008 as "NO TEST" and repeated. Since this did not occur the products containing these serials should not have been shipped before valid testing was completed. These serials were not Eligible For Release as reported on the APHIS Form 2008.

In his attached memorandum, Dr. Tanner stated as follows:

> The 50% infective dose ($ID_{50}$) values reported by the firm are correctly calculated by the Reed-Muench (RM) procedure. However, only one (Ref DA62 5/12/98) of the four assays resulted in a response in which the $ID_{50}$ can be meaningfully estimated by this method. The RM method is a procedure for interpolating between points and should not be used with data that do not encompass a 50% response. It is probably prudent to use only data that include the 50% response level regardless of the method of calculation, although there are procedures that can be used to exstapolate [sic] beyond the observed response based on fitting a distribution to the observed data.

Id. at Bates No. TH01366.

No where did either APHIS, or Dr. Tanner, identify any requirement, either in the Defendant's Outline of Production, or in the governing APHIS regulations, where the assay results, that had been submitted by the Defendant a year and one-half before, failed to comply with a published APHIS requirement. Rather, APHIS -- through Dr. Tanner -- expressed the view that a different calculation would be "probably prudent," but he did not so much as cite any particular treatise, text, or regulation, for that view.

Nonetheless, the Plaintiffs claim that, having failed to report the viricidal test results, in June of 1998, as a "NO TEST," the Defendant breached APHIS substantive standards. In further support for that view, the Plaintiffs offer the opinion evidence of Dr. T. Michael Schwartz, who holds a doctorate in Veterinary Medicine. In a report dated March 28, 2001, Dr. Schwartz expressed his

opinion that, "[b]ased on the applicable industry and scientific standards, the data set forth in th[e] June 22, 1998 bench record should have been reported as a 'no test.'" See, Exhibit F attached to Affidavit of Todd M. Johnson, at 2. Later, in the same report, Dr. Schwartz opines as follows:

> In reviewing the deposition testimony of Christina Furseth of United Vaccines, I realize she suggests that in 1998 there was no requirement to have greater than 50% positive and have less than 50% positive results among the test dilution results to make a valid calculation. While that may have then been the perceptions of Ms. Furseth and other United Vaccines personnel, such understanding was incorrect under industry and scientific standards. Attached is a copy of the original Reed-Muench article, published in 1938 but still regularly relied upon, which ordained the protocol for conducting these tests. You will note that the title of the article is "A Simple Method of Estimating 50% Endpoints." Based upon scientific and industry standards continuously applicable when ever the Reed-Muench test is used, including June of 1998, the failure to obtain a greater than 50% positive at any dilution required the test to be classified a "no test."

Id. at 3.

In addition, the Plaintiffs offer the opinion of Dr. William Wustenberg, who also holds a doctorate in Veterinary Medicine. In his affidavit, Dr. Wustenberg also states that:

> As reflected in the Reed-Muench article, and as understood industry-wide, before the Reed-Muench calculations can be properly applied to underlying laboratory data it is essential that a sufficient percentage of the egg embryos utilized as the growth medium survive

> the process to allow the researcher to extrapolate from the data. Moreover, Reed-Muench calculations require that data be generated on either side of a "50% endpoint" before the Reed-Muench calculations can generate any useful data for determining whether the product was or was not viricidal.

Affidavit of William Wustenberg, DVM, at pp. 4-5.

However, absent from the opinions of both doctors is the slightest suggestion that APHIS required Reed-Muench computations to be calculated only on test results showing over 50% positive, and less than 50% positive, reactions. Instead, during the course of his deposition, which was taken on June 5, 2001, Dr. Schwartz testified as follows:

> Q. * * * Is there anything in the USDA standards which provides for the manner in which the virus titers are to be calculated?
>
> A. The exact methodology?
>
> Q. Correct.
>
> A. Nothing that I can remember in the one for the viricidal test.
>
> Q. Is there anywhere in the USDA standards which provides for the manner in which the Reed-Muench calculation is to be performed?
>
> A. Not that I'm aware of.

Deposition of Dr. T. Michael Schwartz, attached to the Affidavit of Scott P. Drawe, at pp. 43-44.

* * *

> Q. Did you rely on any documents other than the original Reed-Muench article for your opinion that a -- that in excess of 50 percent

positives must be found at one dilution before it is a valid test?

A. I know from historically dealing with USDA back as far as the 1970's, when we did seed lot testing of almost every one of our vaccines, that we were told that at that time in order to have a valid test for doing the master seed work was that was a requirement. That would have been about the middle of the 1970's.

Q. Are you aware of any similar statement being made to United Vaccines?

A. No, I'm not.

Q. Is that statement that a number in excess of 50 percent positive at one dilution level is required published anywhere by the USDA?

A. Not that I'm aware of.

Id. at pp. 47-48.

* * *

Q. Dr. Schwartz, the only scientific article that you've cited in support of your opinion that at least 50 percent positive results at one dilution level are required for a valid Reed-Muench calculation is the Reed-Muench article itself; is that correct?

A. That's correct.

Q. As you sit here today, are you aware of any other articles or scientific writings that support that opinion?

A. I'm sure that other people have written on that subject, but I'm not aware of those. I'm sure that people have done that.

> Q. Have you ever seen any other article than the Reed-Muench article that supports that proposition?
>
> A. No, I have not.
>
> Q. Now, the Reed-Muench article, is there anywhere in the Reed-Muench article that it specifically says that the calculation is not valid in the absence of at least 50 percent positive findings at one dilution?
>
> A. Not that I'm aware of.

Id. at 68-69.

Given this state of the Record, we are hard-pressed to conclude that a published standard, or requirement of APHIS, was breached when the Defendant reported the results of the viricidal activity test, on serial PB13, in June of 1998.

Absent from the Record is any showing that the protocol of the operative Outlines of Production, or any publication, or regulation, of APHIS, required that the results of such testing be reported only when a greater than 50 percent positive response was obtained. Apart from Dr. Tanner's view, that it was "probably prudent" that such a computation be based upon a greater than 50% response, even Reed-Muench expressed no such requirement in their original formulation of the statistical approach. See, Reed, L. and Muench, H., "A Simple Method of Estimating Fifty Per Cent Endpoints," The American Journal of Hygiene (Vol. 27, No. 3, May, 1938), at Exhibit F, at Bates No. 002554 - 022558, attached to Affidavit of Todd M. Johnson.

In addition, we are presented with Dr. Schwartz's historic view that, when he completed such viricidal activity tests in the mid-1970's, APHIS had insisted, at that time, that his results show a greater than 50 percent positive response if they were to be found valid under the Reed-Muench formula. This, however, says nothing about APHIS's requirements, as they existed in June of 1998, nor does it offer more than his conclusory impression, undergirded by ipse dixit, that, under "industry and scientific standards, which have been continuously applicable whenever the Reed-Muench test is used, including June of 1998," "the failure to obtain a greater than 50% positive at any dilution required the test to be classified a 'no test.'" Exhibit F attached to Affidavit of Todd M. Johnson, at 2; see also, General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997)("Trained experts commonly extrapolate from existing data," "[b]ut nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert, as [a] court may conclude that there is simply to great an analytical gap between the data and the opinion proffered.").[8]

---

[8]This same principal applies to the opinion of Dr. Wustenberg, who, like Dr. Schwartz, opines that, under industry standards, data must be generated on either side of a 50% endpoint in order for the data generated under a Reed-Muench calculation to generate useful data. Again, Dr. Wustenberg has provided the Court with no showing of the basis for that opinion. Instead, like Dr. Schwartz, Dr. (continued...)

Nonetheless, we cannot ignore the express observation of an APHIS representative, in January of 2000, that the Defendant's test results, from a year and one-half previously, should have been reported as a "NO TEST." Neither can we exclude the possibility that a greater than 50 percent positive response is as inseparable to Reed-Muench computations, as the mathematical pi is to the computation of the circumference of a circle -- rounding off pi to 3.00, for the ease of calculation, just will not do. We have no evidence, one way or the other, on this specific point and, therefore, we find the existence of a genuine issue of material fact which precludes Summary Judgment on this basis.[9] In the absence, however, of an affirmative showing that APHIS published such a requirement, or that the requirement was otherwise disclosed to the Defendant, prior to June of 1998, or was scientifically subsumed in the Reed-Muench analytical framework, as recognized within the

---

[8](...continued)
Wustenberg relies only upon the Reed-Muench article which, upon our reading, and that of Dr. Schwartz, see, Deposition of Dr. T. Michael Schwartz, attached to the Affidavit of Scott P. Drawe, at p. 69, contains no such requirement.

[9]We have coursed the Record before us, and find no express proof, by the Defendant, that that the industry and scientific standard, under the Reed-Muench paradigm, is not as suggested by Drs. Schwartz, and Wustenberg, although Furseth plainly disagreed with any notion that a 50% positive result was required before an assay could be reported to APHIS as other than a "No test." Accordingly, this aspect of the Record presents a genuine, material issue of fact, that cannot legitimately be resolved upon Summary Judgment.

industry **and** APHIS, we could well be persuaded to reconsider Summary Judgment on this point.

The Plaintiffs argue that, where, as here, a Jury issue remains as to noncompliance with an APHIS requirement, the preemption slate is wiped clean, and they are at liberty to present any State law claim, because "where the federal agency decides that a product has failed to meet [the] standards necessary for sale, state law damage claims do no more than establish an additional remedy for the improper sale of the product," a result that, they urge, is allowed under Medtronics. However, we are required to make "'a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether [the Plaintiffs' claims] fall within the intended pre-emptive scope of the federal regime." Symens I, supra at 1056, quoting Medtronics Inc. v. Lohr, supra at 500. Under that standard of review, the Plaintiffs' claims, which we here examine, must fall as a matter of preemption.

Since the only substantive requirement, that the Plaintiffs have identified as having been breached, is the failure, in their view and, apparently, in the view of APHIS, to report the viricidal test results as a "NO TEST," that purported failure is the focus of our analysis. Essentially, the Plaintiffs' argument is that "but for" the Defendant's failure to properly disclose a "NO TEST," in