June of 1998, the Plaintiffs would not have suffered the losses they now claim. Unfortunately for the Plaintiffs, when rested on such a theory, their claims can only survive if PB13 was other than the Defendants reported on their Form 2008 -- that is, if it was, in fact, viricidal as determined by the APHIS prescribed test. The Plaintiffs have offered no competent showing that serial PB13, under the regulations of APHIS, or the Defendant's approved Outline of Production, was determined to be viricidal. Indeed, all of the evidence, which responds to the APHIS approved test for viricidal activity, proves to the contrary.

Accepting, as we must for these purposes, that the Defendant should have reported a "NO TEST" in June of 1998, the Defendant was entitled, under the APHIS regulations, to retest the serial. See, 9 C.F.R. §113.35(e). When APHIS raised the "NO TEST" issue to the Defendant's attention, in January of 2000, the Defendant retested the serial at the instance of APHIS and, to the satisfaction of APHIS, demonstrated that the serial was not viricidal. See, Exhibit L attached to Affidavit of Todd M. Johnson, at Bates No. TH01109 ("Dr. Tanner has reviewed and is satisfied that both of the retested serials [i.e., those including PB13] meet the validity requirements for conducting the Reed-Munch [sic] calculations of the data."). In addition, the Defendant completed another viricidal activity test in April of 2000, which also demonstrated that

the serial was not viricidal. See, Exhibit H attached to Affidavit of Christina Furseth. Indeed, the Plaintiffs's own expert, Dr. Schwartz, corroborated the nonviricidal results of those retests, agreeing that this conclusion was reached in accordance with the mandates of Reed-Muench. See, Deposition of Dr. Michael Schwartz, at 60-67, attached to Affidavit of Scott Drawe. Apart from the viricidal testing results, the Plaintiffs have failed to identify any other standard or requirement of VSTA, as interpreted by APHIS, with which the Defendant failed to comply.

Of course, we are mindful of the Plaintiffs' contention, that full compliance with the APHIS standards was not accomplished in June of 1998, when APHIS released PB13 for sale, but the Plaintiffs have failed to sustain their burden of demonstrating any substantive noncompliance -- they have failed to demonstrate that, according to APHIS standards and requirements, PB13 was viricidal. We find it telling that, while Dr. Schwartz took exception to the viricidal test results of June of 1998 having been reported as something other than a "No test," he did not regard those test results as "indicat[ing] that PB13 is viricidal." Deposition of Dr. Schwartz, attached to Affidavit of Scott Drawe, at p. 57. Moreover, Dr. Schwartz testified that he was not aware of any testing that was performed, which indicated that PB13 was viricidal. Id.

The Plaintiffs underscore, however, that APHIS continued a hold on the release of PB13, notwithstanding the Defendant's submission of the retests, in January and April of 2000, and that, therefore, this demonstrates that any damage, that they have sustained, was attributable to the Defendant's product. Of course, no one can properly question the formidable powers of APHIS, under the regulations that it promulgated, to exercise its administrative authority to "prevent the preparation [and] sale * * * of any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product for use in the treatment of domestic animals * * *." Title 21 U.S.C. §154. Indeed, a strong argument could be made that, given the outbreaks of distemper, in mink ranches employing the Defendant's vaccine, APHIS was persuaded, by January of 2000, that the Defendant's Outline of Production, as augmented by APHIS's regulations, was not effectively screening that vaccine, but that realization, if it in fact existed, does not sustain the Plaintiffs' effort to enforce requirements which are different from, or in addition to, those promulgated by APHIS. Of necessity, the Plaintiffs would have to do so, since they have presented no proof that the only standard they have identified -- that of viricidal activity, as determined by APHIS -- was breached.

As the Court of Appeals noted, in Lynnbrook Farms, in promulgating its preemption regulations, APHIS expressly declared, "where

safety, efficacy, purity, and potency of biological products are concerned, it is the agency's intent to occupy the field." Lynn-brook Farms v. SmithKline Beecham Corp., supra at 625, quoting 57 Fed.Reg. 38758, 38759 (August 27, 1992). Plainly, in occupying the field, APHIS can exercise regulatory powers that are denied to private litigants through State law claims, as "States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product." Symens I, supra at 1053, quoting 57 Fed.Reg. 38758, 38759.

Apparently, the Plaintiffs would offer proof which, they claim, demonstrates that PB13 was, in fact, viricidal. Accepting that proof as established, for this limited purpose only, it should be sufficient to note that there is no evidence that the tests, which support that proof, comport with APHIS requirements.[10] APHIS

[10]In his affidavit, Dr. Wustenberg avers that he has reviewed the laboratory data of a Dr. John W. Black, who had "performed laboratory tests of his own to determine whether the product demonstrated viricidal activity," and has concluded that Dr. Blacks' laboratory data "demonstrate[d] that the PB13 product was viricidal." Affidavit of William Wustenberg, at p. 5. In describing Dr. Black's testing, however, Dr. Wustenberg discloses that Dr. Black "conducted a viricidal activity assay using his own canine distemper virus isolate that was well adapted to grow on the canine tissue cultures used in his laboratory." Exhibit B attached to Affidavit of William Wustenberg, DVM, at p. 11. However, APHIS requires viricidal activity testing to be performed on embryonated eggs, and not on canine tissue cultures. As such, the results of Dr. Black's experiments would impose upon the Defendant a test of (continued...)

has regulations concerning how a manufacturer must screen its vaccines. Were the Defendant now to be subject to proof based on tests which do not comply with those regulations, we would plainly be subjecting the Defendant to requirements that would be different from, or in addition to, those promulgated by APHIS -- the agency which occupies this field of regulation.[11]

Since each of the Plaintiffs' claims for negligence, strict liability, and for implied warranties of fitness for a particular purpose, or for merchantability, would impose requirements differ-

---

[10](...continued)
viricidal activity different from, or in addition to, that prescribed by APHIS's regulations. See, 9 C.F.R. § 113.302.

The only other evidence that the Plaintiffs identify as suggesting that PB13 was viricidal is a report from a Dr. Victor M. Becerra, of the USDA, which Dr. Wustenberg has identified in his written report. See, Exhibit C attached to Affidavit of William Wustenberg, DVM. The Plaintiffs assert that Dr. Becerra's review of the Defendant's bench records, "relative to various PB serials during the fall of 1999 and winter of 2000, * * * confirmed viricidal activity in the products tested." Plaintiff's Brief at 19. Our review of Dr. Becerra's written report, however, discloses no reference to serial PB13, or inferentially related to it. Accordingly, the Record as presented is bereft of any showing that PB13 was viricidal, under the test prescribed by APHIS.

[11]For the same reason, the Plaintiffs' reliance upon the estoppel doctrine is unavailing, even if we concluded that the doctrine was otherwise applicable. The only substantive requirement of APHIS, which the Plaintiffs have identified as eluding the Defendant's compliance, is the failure to report a "No test," we must, as we have explained, look to the evidence of Record to determine whether the Plaintiffs can demonstrate that PB13 was viricidal under the APHIS regulations, or we would be subjecting the Defendant to requirements which are substantively distinct from those of APHIS. The Plaintiffs have failed to present such evidence.

ent from, or in addition to, those of APHIS, we grant the Defendant's Motion for Summary Judgment as to those claims.[12] See, SmithKline Beecham Corp., Civ. No. 94-103 at pp. 7-9 (D.S.D., September 30, 1999), aff'd, 248 F.3d 1166, 2001 WL 263058 (8th Cir., March 19, 2001); Lynnbrook Farms v. SmithKline Beecham Corp., supra at 630; Cooper v. SmithKline Beecham Corp., supra at 871; Brandt v. Marshall Animal Clinic, supra at 878. We recognize, as Courts generally do when addressing issues of preemption, that the result we reach appears harsh when squared with the just notion that every wrong, if proved, deserves a remedy. See, e.g., Lynnbrook Farms v. SmithKline Beecham Corp., supra at 630; Murphy v. SmithKline Beecham Corp., supra at 818; Brandt v. Marshall Animal Clinic, supra at 878. Nor do we think that it provides the Plaintiffs with much solace to know that, had these claims been litigated in the Minnesota Courts, the same preemption would have been found to exist. See, Brandt v. Marshall Animal Clinic, supra at 818. Nevertheless, we are not jurisdictionally positioned to weigh the pros and cons of APHIS's preemption policy, nor are we at liberty to ignore the

[12]An exhaustive recitation of the elements of proof for each of these causes is unnecessary. Under Symens I and II, to be exempt from preemption, each of these claims would require proof that the Defendant violated a requirement of APHIS and, as we have already detailed, here that would require the Plaintiffs to demonstrate that PB13 was in fact, viricidal under APHIS's testing. The Plaintiffs have failed to meet that burden apart from offering, as proof, testing that was not imposed by APHIS.

precedential authority, in this Circuit, that APHIS permissibly exercised the authority, which had been vested by VSTA, in creating a field of preemption which precludes the Plaintiffs' claims for negligence, for strict liability, and for breach of implied warranties.

2. The Plaintiffs' Claims for a Breach of Express Warranties, for False Representation, and for violation of the Minnesota Consumer Fraud Act.

In their Complaint, the Plaintiffs predicate their breach of express warranties claim upon two representations they attribute to the Defendant. First, they allege that, prior to their purchase of the Defendant's product, a representative of the Defendant stated to the Plaintiffs, on several occasions, that the Defendant's mink vaccine was "95 per cent effective in preventing distemper in mink." Plaintiffs' Complaint, at p. 2, and 5. In addition, the Plaintiffs allege that they "purchased and used the distemper vaccine in reasonable reliance upon material representations of facts and warranties made by defendant on the package label and insert, which included representations that the distemper vaccine 'aids in preventing distemper' and 'BIOCOM-DP has been demonstrated to be a safe and efficacious aid in preventing distemper.'" Id. at p. 2-3. The Defendant does not deny that these representations were made, but relies upon Cooper v. United Vac-

cines, Inc., supra at 871-72, in urging that the Plaintiffs' express warranty claim is preempted.

We find that the Defendant is correct as to the label and insert representation, for APHIS approved that label and packaging, and a Jury would have no right, under State law, to question the propriety of that approval process, for that would invoke a requirement different from, or in addition to, the requirements established by APHIS. See, Cooper v. United Vaccines, Inc., supra at 872; Murphy v. SmithKline Beecham Corp., supra at 818 ("APHIS has also stated that states may not impose 'labeling requirements which are different from or in addition to those in the regulations under [VSTA].'"), quoting 57 Fed.Reg. at 38759; Symens I, supra at 1053 (same). Accordingly, the Plaintiffs' express warranty claim, which is predicated upon the labeling, and packaging of the Defendant's product, is preempted, and the Defendant is entitled to the entry of Summary Judgment as to that claim. Further, because the Plaintiff's false representation, and Minnesota Consumer Fraud Act[13]

[13]The Minnesota Consumer Fraud Act provides, in pertinent part:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether not any person has in fact been mislead, deceived, or damaged thereby, is enjoinable as provided herein.

(continued...)

claims, constitute essentially the same claim, as that presented by the asserted express warranty, but in different garb, we are persuaded that the Defendant is entitled to the entry of Summary Judgment as to that part of those claims which are predicated on the product's labeling and packaging.

We think a different result is required, however, with respect to the "95 per cent effective" claim, as that does not emanate from the labeling or packaging of the Defendant's product, but appears to be a promotional representation employed by the Defendant's Director of Sales and Marketing. Although it appears that the promotional statements made by the Defendant's representative here, are the same, or similar to, the promotional statements that were before the Court in Cooper, that decision merely refers to "statements allegedly made by [United Vaccines Inc.'s] representatives regarding the high 'field effectiveness' of the vaccine * * *." Id. There, the Court concluded that "[t]hese representations are not 'substantially different' from those set forth in the APHIS-approved labeling and packaging that accompanied Biocom-DP" "[a]nd, because they concern the efficacy of the vaccine, a jury would have to find that the vaccine was ineffective in order to return a ver-

---

[13](...continued)
Minnesota Statutes §325F.69 (subd. 1).

Under Minnesota Statutes § 8.31, an plaintiff may bring a claim for damages for a violation of this act.

dict for [the plaintiff]." Id. However, the Cooper Court failed to address the Supreme Court's analysis in Cipollone v. Liggett Group, Inc, 505 U.S. 504 91992)(plurality opinion), in reaching its determination that the express warranty claim was preempted.

In Cipollone, the Court was considering the preemptive breadth of the Federal Cigarette Labeling and Advertising Act of 1965, and its successor, the Public Health Cigarette Smoking Act of 1969. The Court concluded that the Act did not preempt State law claims, which were premised upon express warranties, and reasoned as follows:

> A manufacturer's liability for breach of an express warranty derives from, and is measured by the terms of that warranty. Accordingly, the "requirement[s]" imposed by an express warranty claim are not "imposed under State law," but rather are imposed **by the warrantor.** If, for example, a manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, the duty to honor that promise could not fairly be said to be "imposed under state law," but rather is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law, the particular "requirement * * * based on smoking and health * * * with respect to the advertising or promotion [of] cigarettes" in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded

> as a "requirement * * * **imposed under State law**" within the meaning of [Federal Cigarette Labeling and Advertising Act] §5(b).

Cipollone v. Liggett Group, Inc., supra at 525-26 [emphasis in original].

Subsequently, in American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995), the Supreme Court returned to the same line of analysis but, on this occasion, in determining the preemptive scope of the Airline Deregulation Act of 1978. Once again, the Court declined to extend preemption to State law express warranty claims, reasoning as follows:

> We do not read the [Airline Deregulation Act's] preemption clause * * * to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings. As persuasively argued by the United States, terms and conditions airlines offer and passengers accept are privately ordered obligations "and thus do not amount to State's 'enact[ment] or enforce[ment] [of] any law, rule, regulation, standard, or other provision having the force and effect of law' within the meaning of [§] 1305(a)(1). * * * Cf. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 526, 112 S.Ct. 2608, 2612, 120 L.Ed.2d 407 (1992)(plurality opinion)("[A] common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a 'requirement * * * imposed under State law' within the meaning of [Federal Cigarette Labeling and Advertising Act] §5(b).")。 A remedy confined to a contract's terms simply holds parties to their agreements -- in this instance, to business judgments an airline made public about its rates and services.

Id. at 228-29.

Cipollone has played a role in each of the decisions we have relied upon. In Murphy, the Court observed that, in Cipollone, the "Supreme Court examined statutory language similar to that contained in the APHIS regulations," Murphy v. SmithKline Beecham Corp., supra at 816, while the Court, in Lynnbrook Farms, extensively examined the Court's holding, in Cipollone, when ascertaining the limits of the preemption limned by APHIS. See, Lynnbrook Farms v. SmithKline Beecham Corp., supra at 627-29. Our own Court of Appeals, in Symens I, considered Cipollone, and cited it for the proposition that "some" State common law claims were preempted as a result of the Court's analysis there. Symens I, supra at 1055; see also, Brandt v. Marshall Animal Clinic, supra at 877 (citing Cipollone for the proposition that the preemptive scope of the Federal Cigarette Labeling and Advertising Act "was governed only by its particular language so that the Act did not preempt such common law claims as express warranty or misrepresentation * * *.").

In Symens I, our Court of Appeals concluded that "there is strong evidence that APHIS did not intend to entirely preempt common law remedies." Symens I, supra at 1055. As expressed by APHIS, the intent to preempt was fostered by the concern that "additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe,

potent and efficacious." Lynnbrook Farms v. SmithKline Beecham Corp., supra at 625, quoting 57 Fed.Reg. 38758, 38759. Excluding express warranties from preemption would not frustrate "uniform national standards," nor would it "usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious." Rather, holding manufacturers to their promises, as to the safety of their products, would advance the purposes of the APHIS regulations, by either encouraging manufacturers not to make representations -- outside those approved by APHIS -- which they do not intend to honor, or by holding them responsible for the representations that they do voluntarily offer in promoting sales.

We wish to make plain that, unlike the circumstances considered by our Court of Appeals in Welchert v. American Cyanamid, Inc., 59 F.3d 69, 72 (8th Cir. 1995), where the Court was considering the preemptive breadth of FIFRA, we are not confronted, here, with representations which mirror those contained in the Defendant's labeling and packaging. In Welchert, the Court concluded that the express warranty claim of the plaintiff, there, was preempted, reasoning as follows:

> The express warranty claim of the [plaintiffs] is based entirely on the label's statement with regard to the herbicide's carryover effect. They have not alleged that [the defendant] made any other statements with regard to the product which might serve as the basis for their express warranty claim. As noted in Worm [v. American Cyanamid Co., 5 F.3d 744 (4th

> Cir. 1993)], federal regulation requires a pesticide manufacturer to provide labeling information about rotational crop restrictions. * * * [The defendant's] label statement on rotational crop use is thus a mandated disclosure, not a "voluntarily undertaken" promise.
>
> * * *
>
> In the present case, like Worm, the [plaintiff's] express warranty claim arose solely on the basis of a labeling statement specifically required by federal law and approved by the EPA. For the purposes of our preemption analysis in the present case, we believe that the Fourth Circuit's use of the phrase "required and approved by the EPA," when characterizing the label statement challenged by the plaintiff's in that case, properly limits the scope of FIFRA's preemption of state law breach of express warranty claims.

Id. at 72-73.

Here, the Defendant's promotional statement, that its product would be "95 per cent effective," was not required by any APHIS labeling requirement, at least as disclosed in this Record, and we are unable to conclude, as the Court did in Cooper, that the representation was "not 'substantially different'" from the statements "set forth in the APHIS-approved labeling and packaging that accompanied Biocom-DP." Cooper v. United Vaccines, Inc., supra at 872.[14] To

---

[14]The Plaintiffs do provide a copy of "the May 12, 1995 Veterinary Biologics General Licencing Considerations No. 800.200," which was addressed to all "Veterinary Biologics Licensees, Permitees, and Applicants." Exhibit I attached to Affidavit of Todd M. Johnson. The document states that its purpose is to "provide guidance for developing data to support an Application for a U.S. (continued...)

assure consumers, that a product is effective in preventing distemper -- to the extent of a finite, quantified percentage -- is starkly different from assuring that the product "aids in the prevention of," or "produces a significant effect."

As a consequence, under the circumstances presented here, we conclude that the Plaintiff's express warranty claim is not preempted by APHIS, and we deny the entry of Summary Judgment, in favor of the Defendant, on that claim. Moreover, because, as we have previously stated, the Plaintiff's false representation and Minnesota Consumer Fraud Act claims effectively constitute the same substantive cause of action, we are persuaded that those claims also properly elude Summary Judgment. Again, holding the Defendant to assurances that it gave to the Plaintiffs, either knowing that the assurances were false, or without a sufficient basis to con-

---

[14](...continued)
Veterinary Biological Product License or U.S. Veterinary Biological Product Permit for Distribution and Sale." Id. In the section labeled "Data Requirements," the document details that employing the legend that the product "aids in the prevention of," requires a showing that the product was "demonstrated to produce a significant effect in achieving the claim," whereas the legend, "[f]or prevention of disease due to (certain microorganism) should be reserved for those products shown to be highly effective (95% confidence that they are at least 80% effective) in the prevention of clinical disease in vaccinated and challenged animals." Id. Here, the Defendant's label claimed that its product "aids in prevention of distemper," see Plaintiffs' Complaint, at p. 2, which we cannot, as did the Court in Cooper, accept as being substantially the same as the express warranty that the product was "95 percent effective."

clude that the assurances were true or false, does no more than hold the Defendant at its own peril for making statements, not required by the APHIS regulations, which either are known to be false, or which are uttered with a disregard for their truth or falsity.[15] We are aware of no regulatory authority, in APHIS, which would be dissipated, in any respect, by allowing the Plaintiff's false representation claim to proceed.

As the Supreme Court explained, in Cipollone v. Liggett Group, Inc., supra at 528-529:

> [The] petitioner's fraudulent-misrepresentation claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by [Federal Cigarette Labeling and Advertising Act] §5(b). Such claims are predicated not on a duty "based on smoking and health" but rather on a more general obligation [--] the duty not to deceive. * * *
>
> * * *
>
> State-law prohibitions on false statements of material fact do not create "diverse, non-uniform and confusing" standards. Unlike state-law obligations concerning the warning necessary to render a product "reasonably safe," state-law proscriptions on intentional fraud rely only on a single, uniform standard:

---

[15]Of course, we make no such finding here for, under the Summary Judgment standard of review, we are obligated to assume the truth of the Plaintiffs' allegations, and all reasonable inferences that may be drawn from those allegations. Whether the representations were actually made, and the extent to which they were true or false, if made, remains to be proven at Trial.

> falsity. Thus, we conclude that the phrase "based on smoking and health" fairly but narrowly construed does not encompass the more general duty not to make fraudulent statements. Accordingly, petitioner's claim based on allegedly fraudulent statements made in respondents' advertisements is not pre-empted by §5(b) of the 1969 Act.

The language employed by APHIS, that expresses its preemptive intent, also does not encompass, either directly or by implication, the more general duty that manufacturers owe to the consuming public not to make false statements in their advertisements, or promotions, when those statements have not been approved by APHIS. We are confident that APHIS can properly police, and sanction, those false statements, if any there be, in statements offered to APHIS for incorporation into APHIS-approved labeling and packaging, but we are aware of no mechanism, at least as disclosed in this Record, which extends APHIS's policing powers to advertisements, or promotional statements, which are not submitted to APHIS for approval. Accordingly, we find no tension between APHIS's occupation of the regulating the field concerning the "safety, efficacy, purity, and potency of biologic products," see 57 Fed.Reg. 38758, 38759, and allowing alleged false representation claims to proceed, as to promotional representations, which are not contained in APHIS-approved labeling and packaging.

Accordingly, we grant the Defendant's Motion for Summary Judgment as to that aspect of the express warranty, false representa-

tion, and Minnesota Consumer Fraud Act claims, which relate to statements contained in the Defendant's packaging and labeling of the vaccine in question, but we deny the Defendant's Motion as to the Plaintiff's express warranty, false representation, and Minnesota Consumer Fraud Act claims, which arise from the representation that the product would be "95 per cent effective."

NOW, THEREFORE, It is --

ORDERED:

That the Defendant's Motion for Summary Judgment [Docket No. 24], is GRANTED in part, and DENIED in part, as more fully detailed in the text of this Order.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE